Let's move to our third case this morning, United States v. Lorenzo Johnson. Good morning, Your Honors, and may it please the Court, I'd like to begin, if I may, with the District Court's denial of the motion for new counsel, and then shift to the sentencing question and return at the end to the motion for new trial. The District Court, acting through the Magistrate Judge, abused its discretion when it denied Mr. Johnson's request for new counsel a year before his trial, without inquiring of Mr. Johnson about the reasons for that request, and without allowing him to speak or elaborate at the hearing about that request. A year before trial, Mr. Johnson submitted pro se, handwritten letters to the Court, and in response, the Magistrate Judge held a hearing, but announced that it was striking those letters, it was not reviewing them, it instructed Mr. Johnson not to speak. When Mr. Johnson's counsel suggested that the Court should hear from Mr. Johnson, the Magistrate Judge responded, well, we're not going to do that, and again instructed Mr. Johnson not to speak, and explicitly said that the Court would not consider the merits of the motion at that time. But what did the Magistrate Judge do? I have to tell you, when I read the description of that hearing in your brief, I was pretty concerned about it. When I read the transcript, I was less troubled by it. It looked to me like the Magistrate Judge was saying, look, if you're going to be communicating directly with me, there's this risk of disclosing confidential information, yada yada. Talk to your attorney. If you want him out, just tell him so, he'll file the motion, but if I don't hear from you, I'm going to assume you guys have worked this out, and didn't hear from him. That seems to me like a pretty reasonable way, at least ordinarily, for dealing with the first sign of trouble that the Court gets between counsel and client. I agree with the facts Your Honor summarized. I remain concerned, and let me explain that. So what the Magistrate Judge did was it had two lengthy handwritten letters from Mr. Johnson explaining that he was not seeing his lawyer, that his lawyer was not filing motions, and that his lawyer was waiving speedy trial and not telling him. And in response to that, the Magistrate Judge said, well, your lawyer's busy with this murder trial, he'll go see you in two weeks, and then he'll let me know if everything's okay, but I'm striking your pleadings, and you're not to send me any more letters. A year later, we have Mr. Johnson saying that his lawyer's still not coming to see him, not responding to him, not filing motions that he requests, and his lawyer says, I filed this motion to withdraw because I was growing physically afraid of my client, and I was worried that there was a barrier between us. That's the level of emphasis Mr. Johnson had to bring to get his lawyer to finally file a motion that he had been asking for for a year. So I think that the Magistrate Judge was well intentioned, and certainly the hearing reads as a judge trying to look after protecting a defendant's right to silence and making sure that he doesn't harm his own defense. But the proper procedure for that, as laid out by this court, was to have a sealed hearing, which is what the district court did a year later, and inquire of the defendant about what is going on. And a year later, they still have many of these same problems. A year later, Mr. Johnson still doesn't understand what the trial strategy is. He doesn't understand why his lawyer's not filing a motion to suppress. That's pretty important, because in the intervening year, the opportunity for a plea had come and gone. It would have been really important to know and understand why you should more seriously consider this, because this motion to suppress you're talking about has no chance, as the district court explained to him. Mr. Johnson said at the sealed hearing the district court conducted a year later, well if I would have understood that, if anybody ever would have told me, but he never told me. Mr. Johnson and his counsel disagreed at that hearing about whether he was seeing his discovery, whether his counsel was meeting with him. So what we know from the record that we have is that there was a real problem in communication between the two of them, and there was no inquiry, and in fact a refusal to inquire a year before trial, when certainly counsel could have been appointed then without delaying proceedings at all. There's no indication that at that point there was an attempt to delay. And the government- Do we have any indication that Mr. Johnson, after that first hearing before the magistrate judge, told his lawyer, Mr. Tavides, I want you out, filed a motion? So we don't have that in the record, but I think it's important to understand why we don't have that in the record. Because at the time this case was happening, for much of the period, there were restrictions because of COVID. Right. And people were appearing remotely. Mr. Johnson never appeared in court again until the hearing filed by his counsel on the motion to withdraw. His counsel appeared, but he never appeared. And he'd been told not to send letters, and he'd had his letters stricken from the record. So we have no indication from him that he told Mr. Tavides, I want you out, filed a motion, until just before trial, correct? So at the inquiry, at trial, we don't- it's not in the record. We don't know. At the inquiry, at trial, he wasn't asked about that. He was asked about what's going on now, but he did tell the court, I've been having this problem. We were here a year ago because I've been having this problem, and nothing's changed. So I think it's important to look at it from Mr. Johnson's point of view, where he is sitting in prison alone, his co-defendant's out on bail. He's not getting an answer from his lawyer about why he's not out on bail. And his speedy trial rights are being waived by his lawyer without his knowledge, and when he tells the court- The co-defendants are the mothers in this case? Yes. I think everyone in- we all understand why, but Mr. Johnson did not understand why, and it was his lawyer's job to tell him. And during that time, his lawyer's not telling him what's going on, and when he tells the me afterwards, my lawyer's not coming to see me, the court's response is to say, I'm not going to consider anything from you. It's to protect you from revealing information that could be used against you, but you have to go through your lawyer. And his lawyer says, I'm going to be in a murder trial, I'll see you in two weeks. So I don't think that was- Well, there was a little more to it than that. The magistrate judge did inquire about the communications problem that was evident by virtue of the letter that he had received, and was given an answer by counsel that there was a miscue about whether the defendant would be retaining private counsel or his own paid counsel, and that that miscue had been cleared up and communication had been re-established and counsel understood the situation to be reparable and needed an opportunity to re-establish that relationship. That seems to me as a perfectly reasonable response on the part of the magistrate judge, both preventing the defendant from unduly disclosing something on the record through pro se letters to the court, but also addressing the communication problem that seems to have arisen and putting the relationship back on a sound footing so that it could proceed, and instructing both the attorney and the defendant that if there was a problem that would be resolved through counsel. I can't see a flaw in the way that the magistrate judge handled that. Sure. And again, I agree with your summary, but the flaw to my mind is the fact that Your Honor did not mention Chief Judge Sykes, which are that after hearing that explanation from counsel, counsel said, but I think you need to hear this from Mr. Johnson, and the magistrate judge said, no, I will not hear anything from Mr. Johnson on this, we will not inquire this. And the procedure that this court has set forth to deal with that is to conduct a hearing and exclude the government, which is what the district court did a year later, and what the magistrate should have done a year earlier. That's our concern, is that it sounds very reasonable when we hear from counsel, but what we're hearing from counsel are not the things that were in Mr. Johnson's letter to the court. What they're saying to the court doesn't line up, and rather than inquiring further, the magistrate said, no, this needs to go through counsel. And procedurally, the problem with that, although it's well-intentioned, is that it leaves the fox guarding the henhouse, because if you really have a bad defense attorney, you can't get rid of them unless they agree to file the motion. And that's why that's not the proper response when somebody's filing a pro se motion for new counsel. That's different than any other pro se motion, because a pro se motion for new counsel doesn't create the concern of, well, you're proceeding with one defense through counsel and one defense pro se, and you can't ride both horses. But a pro se motion for new counsel is a way to alert the court that, hey, something's really wrong here. What you're hearing from my counsel is not what I want you to be hearing. It's not what I'm hearing from my counsel. There's a real problem, and please, court, you need to inquire more, because I can't hire my own counsel, because I'm indigent. And so counsel's explanation to the magistrate judge certainly sounded good, but I think where the magistrate judge erred, and I do think it requires at least a limited remand for an inquiry about what was happening at that time, is in not hearing from Mr. Johnson. And in the short time I have left, I do want to discuss the sentencing issue, if I may. So there's no dispute that these charges are very serious, to carry a recommended life sentence for conspiracy to produce child pornography and possession of a handgun by a convicted felon. Those are serious charges, but it's so important that when sentencing on these serious charges and giving a substantial sentence, that the court be relying upon accurate and reliable information. And the government's correct that no one disputes that Mr. Johnson's co-defendant, Ms. Gallard, committed suicide. But what Mr. Johnson did not have notice about was that he was going to be held responsible for causing her suicide. And we set forth on pages 10 and 11 of the reply, the entire paragraph that the government says in its memorandum, should have put Mr. Johnson on notice that we're going to say you caused this. And certainly, they mention that she's committed suicide, and they refer to Mr. Johnson leaving unspeakable ruin. That's a weighty argument. But what they don't do, is they don't say, as they do at the sentencing hearing, that Mr. Johnson's conduct caused this suicide, as the district court concludes at the sentencing hearing that Mr. Johnson's conduct caused this suicide. And that was clearly erroneous, because we don't have the information to make that conclusion. We don't know why Ms. Gallard committed suicide. We don't know if there was a note. We don't know her mental health history. We don't know the circumstances of it. There was a mention at the final pretrial hearing by defense counsel that she may have hung herself after giving birth to a child, but we don't know where prior counsel got that information, and it was not on the record at the sentencing hearing. So without more information, suicide is such a personal, multifaceted decision, and it's linked with mental health, and we don't know her mental health history. And without that information, it was erroneous to conclude that Mr. Johnson caused it. So was the district court prohibited from acknowledging the fact of her suicide? No. And that goes further than our argument. We certainly don't argue that the district court could not acknowledge the fact of her suicide. But the district court went much further. I'm sorry. Well, yeah, the problem is that crimes can have an awful lot of ripple effects, and that we can see, and you may or may not be in a position to make but-for-causation decisions about it, and we usually don't litigate those things, right? We just acknowledge, okay, these are consequences of this crime. There's no specific adjustment to the guidelines for this. So I'm trying to figure out how significant the district court's acknowledgement was in ultimately driving the decision. Very briefly, and then I would like to reserve. But the district court said the worst tragedy of all this was Ms. Gawler's suicide. The district court said that Mr. Johnson caused the suicide. The district court said no one could conclude otherwise, said this is the worst kind of offense, short of homicide, and that that was the effect here with Ms. Gawler's death, essentially equating this to a homicide. So the district court was very clear that for suicide to weigh heavily on its mind. I read the homicide equation a little differently, just that the guideline offense levels here are comparable to homicide. The guideline offense levels are comparable to homicide, and I think that was part of what the district court was saying, is that the sentencing commission treats this as seriously as any other crime other than homicide, and it then went on to say, and that was the effect here, that you caused Ms. Gawler's death. The word cause was not used. Her death was a consequence of the course of conduct here. There was not causation language used by the judge. There was not fact-finding going on in the sense that you're suggesting. So I don't think we have a procedural due process violation. May I respond? So I apologize for misquoting the language, but I think the consequence of your actions I think is understood to be a finding of causation, and the district court said that the offense played a role in her suicide, no one could conclude otherwise. I don't think that's supported by evidence to know what her decision-making was in committing suicide, and without that, before holding someone responsible for the death of a human being, we should have a more complete record and an opportunity to respond to that. Thank you. Mr. Whelan. Thank you, Your Honors. May it please the court. Nathaniel Whelan here on behalf of the United States of America. Your Honor, I'll start with the substitution motion. It's important to realize, recognize what happened with the first motion. The court didn't deny the motion to substitute counsel. It struck a pro se motion because the defendant was represented. And I think Your Honors have properly noted kind of what the magistrate judge, a former federal defender, did do in that hearing. He explained to the defense and the defendant, here's the proper procedure. And he let Mr. Johnson talk. He said to Mr. Johnson, do you understand that Mr. DeVita, the defense counsel, is going to come talk to you? Do you understand if you want to remove him, you file a motion through defense counsel? And Mr. Johnson said yes, he understood that. Your Honor, Judge Hamilton asked whether there was any evidence in the record about whether there was a second motion or dissatisfaction with Mr. DeVita's representation. There is no second motion, but if you look at the hearing that the district court judge had two days before trial, he asked about this motion, the first hearing. And it's on page 11 and 12 of docket 139. The district court says, you sent a letter to Judge Martin. Did he do anything about it? The defendant says, yes, we had a conference. The defendant says, yes, I was at the conference. The court says, did you inquire about the nature of what was going on? Did Judge Martin inquire about the nature of what was going on between you two? The defendant says, yes. And the court says, at the conclusion, it was decided Mr. DeVita would continue to represent you. Mr. Johnson said yes. So Mr. Johnson is acknowledging his claim at that time a year before was resolved. He was not upset with Mr. DeVita's representing him at that point. He understood clearly how to ask Mr. DeVita to file a motion through counsel because that's what happened two days before trial. Respectfully, I don't look at this hearing as Mr. DeVita saying, I was concerned about my safety and so that's why I filed this motion. The defense counsel tells the court, I filed this motion because the defendant asked me to. The defense counsel knew his obligations. I am not inclined to believe that a defense counsel is going to not file a motion because the defendant, you know, he doesn't want to get removed from the case. This defense counsel, I think, acted as this court has asked him to do previously and as this court asked defense counsel to do. Your Honors, I actually don't have a whole lot else to cover on the motion to substitute counsel unless this court has any questions, I think. At the second motion, even if this court were inclined to find a problem with the first motion. It was the letter, a motion for substitution of counsel. It's really hard to read it that way because it was reporting a whole host of concerns, notably the release on bail issue and so forth and the communication issue with counsel. But it wasn't, it didn't include a request for a new attorney. It included an inquiry about the possibility of getting a new attorney. But I don't know that anybody was treating it as a formal motion, per se. I'm sorry, I'm sorry to interrupt, Your Honor. I think that's a fair representation. I do think Judge Martin appropriately held a hearing on this to explain to defendant, you know, if you do want new counsel, if you do find that you're not talking at any point, that the communication is broken down, this is how you go about doing it. And I think that's what we want magistrates to do, to explain to defendants, this is the mechanism to do it. Right, and to clarify the communication problem that existed and address it early. And to clarify what it was the defendant wanted through this counsel. I agree with that, Your Honor. And I think if you look at the second motion, again, the hearing explains kind of that the defendant was happy with defense counsel until we get prior to trial and then we run into some issues. At that point, Judge Simon had a lengthy hearing, about 30 minutes, got to the heart of the matter, determined that there was no breakdown in communication and appropriately denied the motion. It was not abuse of discretion to do so. So unless Your Honors have any questions on that, I'll move on to the sensing issues, since that was the other issue raised in the first instance in the opening argument. Judge Hamilton, I read the transcript the same way that I think Your Honor might be reading it, which is Judge Simon's not making a finding of fact. He's talking about the ripple effects and the nature and characteristics of the defendant's conduct. And he's talking about the egregious nature of what happened as a result of this case. You know, children were left without mothers. Children are going to be left with this kind of permanent record of what happened to them. Some mothers were indicted and one mother's dead. This court's cautioned in the Ocasio – I apologize, Your Honor. I want to make sure I get this name right because I'm not great at names here. In the Orozco-Vazquez opinion, to be careful not to equate everything a judge says during a sentencing hearing as a finding of fact. What the courts can do is they can talk about the nature and offense of – the nature – characteristics and the nature and offense of, you know, the offense conduct here. That's what Judge Simon was doing. He was talking about the defense – the defendant's actions resulted in kind of this ripple effect or what the government called in its sentencing memos this unspeakable ruin in this wake. You know, this is the nature and characteristics of the offense. This is what happens when you engage in the conduct that Mr. Johnson did. That was not a finding of fact by the district court. There is no but for causation. There is no reference to you are the cause of its effect. The court was just saying, Mr. Johnson, your actions left this wake. And I don't think there's any dispute that Mr. Johnson's actions, you know, were part of what happened here as it relates to Ms. Scholar. So unless this court has any questions on that, I'm happy to discuss the motion for new trial, Your Honors. I guess just we would note that this court said that impeachment information is really rarely going to be a basis for a motion for new trial unless it's, you know, kind of a case where you have a single witness and it turns out the impeachment information reveals that they are beyond belief. That is not this case, Your Honors. This case is based on the defendant's confession. It's based on the Facebook chats. It's based on the Samsung phone that was found in his apartment that he had the password to, that he admitted was his, that had all the images charged in this case, that he had saved locally within minutes of this Ashley Campbell account receiving them. That really is the evidence in this case. And the agent's testimony was pretty much foundational and just reading these chats to the jury. This case didn't hinge on them. So, Your Honors, unless this court has any questions on any of these issues, we would ask that you affirm Mr. Johnson's conviction and sentence. Thank you. Thank you. Thank you. Mr. Newhall, I think your time had expired, but you can have two minutes in rebuttal. We kept you going with the questions. Thank you. Very briefly, however the court resolves this case, I would urge the court to reaffirm that the best practice is to inquire of the defendant at a sealed hearing when there's a problem with counsel. I think that's an important rule procedurally. I think it would have helped here. Mr. Johnson might have wound up with new counsel he was happier with a year before his trial, and that issue wouldn't arise. And so, however you resolve that particular issue or how the magistrate judge handled it in this case, I understand we may see it differently. I think it's important to reaffirm that rule. And then, finally, there was a direct argument by the government at sentencing that he is responsible in some way for misconduct or suicide. The government made that argument orally. It didn't set that out in the sentencing memorandum. And as Chief Judge Sykes pointed out, there was a statement by the court that that's the consequence of it anyway. You didn't have any intention of that happening. I'm not suggesting that, but that was the consequence of it. When the consequence of your action is causing another human's death, that's usually manslaughter. That's a very serious conclusion, whether it's labeled an inference or a factual finding. And I don't think it was supported by this record because we have no information about what took her to that place. Thank you. Thank you very much. Our thanks to both counsel. The case is taken under review.